

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00026-CR

_____

JEFFERY WARREN CORY, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1586227D

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

## I. Introduction

Forty-year-old Appellant Jeffery Warren Cory was having a bad day at work on Wednesday, February 27, 2019, when he received a text from his roommate Erik Fernandez with an ultimatum about the rent he owed. Later that evening, Cory and Fernandez had an argument that resulted in Fernandez's death from a gunshot wound to the back of his neck. Cory then disposed of the gun in Lake Weatherford, moved Fernandez's vehicle to a nearby high-crime apartment complex—where he left the keys on the console and the driver's-side door ajar—rolled Fernandez's body in the living-room rug to move it into Fernandez's bedroom,[1] mopped up the blood, spent his day off with friends, went to work on Friday, and got fired. He called 911 on Friday night.

When the police arrived, Cory told them that he had not seen Fernandez in a couple of days and then found the body. However, after fourteen hours in a police-station interview room, Cory confessed to having shot Fernandez. A week later, Cory gave a television interview in which he stated that he had put a bullet in the back of Fernandez's head "to make sure that he was dead so he wouldn't suffer." Although Cory claimed self-defense, a jury found him guilty of murder with a deadly weapon

---

[1]Cory wrapped the rug with a tarp and used Christmas lights to secure the wrappings.

and assessed his punishment at confinement for life. *See* Tex. Penal Code Ann. §§ 12.32 (first-degree felony punishment), 19.02(c) (murder).

In eleven issues, Cory complains that the evidence is insufficient to support his conviction; that the trial court should have granted a directed verdict for him at the close of the State's case; that the trial court abused its discretion by denying his mistrial request; that the trial court abused its discretion regarding a variety of evidentiary complaints; and that the cumulative effect of these errors deprived him of a fair trial. Concluding that the evidence is sufficient to support his conviction, that the trial court did not abuse its discretion by denying his mistrial request, that—to the extent he preserved his evidentiary complaints—the trial court did not abuse its discretion, and that he was not deprived of due process based on cumulative error, we affirm.

## II. Sufficiency

In his first two issues, Cory complains that the evidence is insufficient to support his conviction and that the trial court erred by denying his motion for a directed verdict based on his self-defense theory. Because a motion for directed verdict is essentially an evidentiary-sufficiency challenge, we will analyze both issues together. *See Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990).

### A. Standard of review

To convict Cory of murder, the jury had to determine beyond a reasonable doubt that he had intentionally or knowingly caused Fernandez's death by shooting

3

him with a deadly weapon or that he had intentionally, with the intent to cause serious bodily injury to Fernandez, committed an act clearly dangerous to human life by shooting him with a deadly weapon, which caused Fernandez's death. *See* Tex. Penal Code Ann. § 19.02(b)(1)–(2). Further, the jury had to determine that Cory's actions were not in self-defense. *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991) (stating that self-defense is a fact issue for the jury).

Under the Penal Code, a person is justified in using force against another when and to the degree he "reasonably believes the force is immediately necessary to protect [himself] against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a). To justify the use of deadly force, the person using it must reasonably believe that deadly force is immediately necessary to protect himself from another's use or attempted use of deadly force. *Id.* § 9.32(a); *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). After a defendant has introduced some evidence of self-defense, the State bears the burden of persuasion to disprove it. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *Zuliani v. State*, 97 S.W.3d 589, 594 & n.5 (Tex. Crim. App. 2003). The State's burden does not require it to introduce evidence disproving the defense; rather, it requires the State to prove its case beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 608.

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.

307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021). The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine evidentiary sufficiency to disprove a self-defense theory, we ask whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against the appellant on the defensive issue beyond a reasonable doubt. *Id.* at 609; *see Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

**B. Directed verdict**[2]

**1. The State's case**

The State offered many witnesses and exhibits to illustrate how Cory had repeatedly lied about Fernandez's death and his role in it, and the trial court admitted most of the exhibits and allowed their publication to the jury.

**a. 911 calls**

The State's first two witnesses, records custodians, sponsored Cory's 911 calls. In the first call, Cory told the Fort Worth Police Department his address and said that his roommate had been gone for two days before his call was transferred to the White Settlement Police Department. In the transferred call, Cory reported that he had thought his roommate was in Denver, and when he let their dogs into the roommate's room, he found him rolled up in a carpet. The call was transferred to "medical 911," and then Cory stated that he had come home and found his roommate, who had been missing for the last few days.

**b. Former White Settlement Police Officer Joshua Greer**

Greer was the first person on the scene and encountered Cory in the driveway. When he asked Cory what was going on, Cory took him "straight to the victim's bedroom," where he saw an "object wrapped in a rug, a tarp, and some Christmas lights." Greer's body camera recorded everything, including the living room television,

---

[2]We combine our evidentiary review with our analysis to avoid repetition.

which showed 7:17 p.m. when he entered the home.[3] At 7:23 p.m., emergency personnel confirmed the time of death.

Cory told Greer and other officers that he had seen neither Fernandez nor Fernandez's Jeep for several days and that he had been home from work for a few minutes before he saw the body and called 911. Cory was cooperative and answered their questions.

Greer took photos of the home's interior and did not see any signs of forced entry or blood. One of his photos was of the home's thermostat, which had been set on 60 degrees despite the day's chill. Cory gave the police consent to search the home, but the search was delayed by the home's bed bug infestation.

Cory also gave a voluntary statement, which set out a disjointed, reverse chronological narrative:

> Woke up at 8:30 a.m. this morning, March 1st, and drove to work in Dallas by 10:00. I also took the dogs out to go potty. Arrived at the house at 7:00 p.m. And after dogs scratched by his bedroom door, I opened and called 911.
>
> I went to work on Wednesday [February 26] as well as the last time I saw his car and returned around 12:00 a.m. February 27th, Thursday, and February 28th, Friday, took care of dogs and started to wonder where his car had been. He told me he was going to drive Seth's dog and truck to Denver and fly back. February 25th, Tuesday, went to work like usual at 9:00 a.m. Got back from work by 8:00 p.m. where we talked in passing and then I went to my room.

---

[3]Greer's body camera footage matched his testimony.

Cory told Greer that he had known Fernandez for five or six years, that the last time he saw Fernandez was on Tuesday morning, and that it was normal for them to not see each other because Cory had five jobs and only came home to sleep.

The trial court admitted MedStar's report through Greer over Cory's objection and allowed the State to publish by summarizing the report.[4]

### c. White Settlement Police Sergeant Brad Bukowski

Sergeant Bukowski arrived at the scene after the emergency responders. Cory initially told Sergeant Bukowski that he had last seen Fernandez on Wednesday morning—two days before—and, to account for the absence of Fernandez's Jeep, told him that Fernandez might have loaned it to someone. Cory told the sergeant that his last conversation with Fernandez would have been on the night of Tuesday, February 26, and that Fernandez had been sleeping on the living-room couch because of the bed bugs. He told the sergeant that Fernandez had purchased the living-room rug he was wrapped in. When Sergeant Bukowski asked Cory why he had not noticed that the living-room rug was missing, Cory told him that he had thought Fernandez was going to do something with it.

The police took Cory to the police station because he had nowhere else to go while they searched the home, and they put him in an interview room because they

---

[4]White Settlement Firefighter Tyler Reid's report, State's Exhibit 22, was admitted during his testimony, was published by reading to the jury, and reflected the same information as MedStar's report. Because Fernandez's death is undisputed, we do not set out these reports in our summary.

had nowhere else to put him. Cory stayed in the interview room for approximately fourteen hours because the medical examiner—whose task it was to unroll the body—did not arrive at the scene until 3:21 a.m.

After a five-hour search of Cory's residence, Sergeant Bukowski went back to the interview room and read to Cory his *Miranda* warnings.[5] State's Exhibit 31, the fourteen-hour redacted recording of Cory in the interview room, was admitted into evidence without objection and selected portions, summarized below, were played for the jury.

### (1) The first hour

During the two-minute clip, Cory sat in the interview room with the door open, and White Settlement Police Lieutenant Denise Callahan told him that "some of this may take a really long time" and asked him if he had somewhere to go for the evening or for a couple of hours because he could not go back into the house during the search. Cory said he had nowhere else to go.

### (2) The second hour

During the seven-minute clip, Cory sat with his head on the table until Sergeant Bukowski entered the room to ask some questions. Sergeant Bukowski recounted what Cory had already told him—the last time he spoke to Fernandez was on Tuesday and the last time he saw Fernandez or Fernandez's Jeep was at around 9 a.m. on

---

[5] *See Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612 (1966).

Wednesday when Cory left for work—and then Cory told him that on Thursday, he had been off from work and went to a friend's house all day—10 a.m. to 10 or 11 p.m.—and did not see Fernandez or the Jeep.

### (3) The eighth hour

In a brief segment, Sergeant Bukowski returned, offered to charge Cory's phone, and told him that they needed to take his clothes. The police provided Cory with some new clothes and a blanket. The jury did not see the portion of the video where Cory laid down on the interview room's floor and went to sleep or when Sergeant Bukowski entered the room without waking Cory and left him something to eat.

### (4) The ninth hour

During the eleven-minute clip, at around 9:25 a.m., Sergeant Bukowski entered with another officer, who took gunshot residue from Cory's hands. When asked the last time he had fired or handled a firearm, Cory said, "A year ago." He denied that he owned a gun or that they would find bullets in the house.[6]

### (5) Interim search activities

While Cory waited in the interview room, the police searched his residence. The medical examiner ruled the death a homicide after unrolling the rug to reveal a

---

[6]Not long after Sergeant Bukowski asked him about gun ownership, Cory began eating. Three minutes later, he vomited. He drank some water and then vomited again. Sergeant Bukowski testified about Cory's vomiting twice right after being asked about whether he owned a firearm.

spent .40-caliber round and shell casing. Contrary to Cory's having told the police that he did not own a gun or ammunition, the police found some .40-caliber bullets in his bedroom. The police also used Bluestar luminol, which shows the presence of blood, and which revealed some of what Cory had tried to conceal.

### (6) The tenth hour, part one

In the first twelve-minute segment of the tenth hour, Sergeant Bukowski again read to Cory his *Miranda* warnings and then asked him for another chronology, starting with Thursday morning.

### (7) The tenth hour, part two

In the tenth hour's second segment, which lasted a little over an hour, Sergeant Bukowski asked Cory about his relationship with Fernandez, and Cory told him that they had known each other for five or six years because they had bartended together and that he had considered Fernandez a good friend. Sergeant Bukowski continued to question Cory about his activities, what he remembered about any vehicles near the apartment on Friday when he left and when he came home, the body's positioning when he opened Fernandez's bedroom door, what his last conversation with Fernandez had been about, and where Fernandez had worked. Sergeant Bukowski also asked questions about Fernandez's daughter and about who might have Fernandez's Jeep. Lieutenant Callahan asked Cory what happened to his face and head, noticing that he had scratches, and he replied that some of the marks were caused by bed bugs and others from shaving his head. When she asked about the

11

scratches under his eye, he said they were from his cats. He denied that any person had caused the scratches on his face or that he and Fernandez had ever physically fought.

Cory told Sergeant Bukowski and Lieutenant Callahan that Monday or Tuesday had been the last time he and Fernandez had exchanged cross words and that the conversation had been about money. He gave them consent to review his phone. They left him alone in the room for a minute before Sergeant Bukowski returned, asked him about Fernandez's ex-wife, and told him that they wanted to give him the chance to add to his statement because his story did not match the evidence the police had found. Cory twice more denied that there were guns or ammunition in the house. When Sergeant Bukowski asked him when he had last been around a firearm, Cory told him that it had been a long time. When Lieutenant Callahan asked him why they would find ammunition in his bedroom, Cory replied, "I don't know," and said that he did not have anything with which to shoot it.

Sergeant Bukowski asked about blood in the house, and Cory referenced the bed bugs. When Sergeant Bukowski said that there was an inconsistency with Cory's clothing as to blood, Cory said that he was always making himself bleed and that he did not know that there had been blood on his clothes or how it could have gotten there. When Lieutenant Callahan asked whether he had ever harmed Fernandez, Cory replied, "No."

## (8) The twelfth hour, part one

When Sergeant Bukowski returned to the interview room after a short break, Cory prefaced his statement by saying, "I know that lawyers always say never do this." Cory then told him that he had been having a bad day at work on Wednesday when he received a text from Fernandez telling him to pay $700 by March 4 or Fernandez was going to change the locks.

After receiving the text, Cory went out and had a few drinks. When he got home between 11:30 p.m. and midnight, he tried to be quiet, but Fernandez arose from the couch and followed him, stepped into Cory's room, grabbed Cory by his shoulder, and yelled at him that "some of us have to be at work at 6 o'clock in the morning." Cory said that he had had enough, so he grabbed his .40-caliber Smith & Wesson gun from a box in his room, entered the hallway, pointed the gun at Fernandez, and told him, "This is bullsh-t, man."

Cory told Sergeant Bukowski and Lieutenant Callahan that the first shot mis-clipped because it was not chambered right, and then Fernandez grabbed him and said, "Really, [Cory]?" Fernandez hit him in the face, causing the injury under his eye, and they struggled over the gun. Cory said that he hit Fernandez with the blunt side of the gun, gesturing at a height. He fired again when he regained control of the gun.

Cory said that Fernandez hit the ground face first and, thinking that he had shot Fernandez in the abdomen, he did not want Fernandez to suffer, so he shot him again. Cory said that he had not known what to do and "freaked." He rolled

13

Fernandez up in the living-room rug, left him in front of the television, and went to Weatherford to gather his thoughts. On Thursday morning, he spent time with his friends in Weatherford because he did not want to be in the house. Cory threw the gun in the lake before going to see them, and he did not tell them what had happened.

When he came home, he had not known what to do, but he moved Fernandez's body into the bedroom because of the dogs. He mopped up the blood with Mr. Clean, which he left under the kitchen sink, and he left the mop next to the refrigerator. He left Fernandez's Jeep parked "down the street," and he drew the police a map to the Jeep.

Cory confessed that he had called the police because he "had to," because Fernandez had been his friend and deserved a proper burial, and because it was the right thing to do. Cory said that he wished he had done the right thing on Wednesday and that the fight had never happened; he pointed to his wound under his eye as having been from the struggle. Cory said that he wished he had "finished himself at the same time," and he observed that he would "serve [his] time now" and that his sentence would probably be life.

Cory stated that he had not intended to shoot Fernandez that night, but he "took it for so long," and when Fernandez stepped into his room and grabbed him, he reacted and grabbed the gun. Cory said that the clothes they had taken from him were the same ones he had worn that night and that he had not showered since that night and had been unable to eat. He then began crying.

14

### (9) The twelfth hour, part two

In the last four-minute segment shown to the jury, Cory signed another consent to search, and the police handcuffed him to drive him to his home and then to Lake Weatherford so he could show them where he threw the gun.

### (10) Post-interview activities

The police collected the mop and the bottle of Mr. Clean from where Cory said they would be.

### (11) WFAA interview

Sergeant Bukowski testified that he became aware after Cory's arrest that Cory had given an interview to WFAA, a local television station. The trial court admitted State's Exhibit 35, the interview, into evidence over Cory's authentication objection and allowed the State to publish it.

The news segment, which lasted 2 minutes and 21 seconds and which was filmed a week after the shooting, began with the introduction, "Tonight, a man admits to killing his roommate and living with the corpse for days." Cory, who was in the Tarrant County Jail, told the reporter that it was "something [he] would regret for the rest of [his] life." Cory stated that he had known Fernandez for six years and that Fernandez had been one of his best friends, and the reporter recounted in a voice-over that Cory had told him that Fernandez had nagged him about his drinking, had threatened to kick him out, and had not liked that Cory kept a gun for safety.

The reporter recounted, "Last Wednesday, they got in a fight after [Cory] came home late"; Fernandez grabbed Cory's shoulder, and Cory grabbed his gun. Cory stated, "We wrestled in the hallway," and the reporter added, "He claims it misfired, hit [Fernandez] in the stomach. But what happened next was no accident." Crying, Cory told the reporter that he had not wanted Fernandez to suffer because Cory had "f-cked up," so he put a bullet in the back of Fernandez's head "to make sure that he was dead so he wouldn't suffer."

In another voiceover, showing the home's exterior, the reporter stated, "[Cory] didn't call 911. He says he dragged his friend's body back to his room in a rug, then drove to the lake to toss his gun. The next day, he went to work." Cory told the reporter, "I was scared." On location outside of the home, the reporter stated, "On Friday, [Cory] finally called 911, and when police arrived here, at first, he told them [Fernandez] had been missing for several days and that he found his body inside his room. But after he was questioned, it didn't take long for him to confess." Back in the jail, Cory stated, "His daughter is really going to want to know, for closure." In another voiceover, the reporter stated, "He's now charged with murder for a moment he can't take back." When asked by the reporter what he wanted to say to Fernandez's family if they were watching the report, Cory replied, "I'm sorry. It shouldn't have happened." The reporter concluded the segment with another voiceover, stating, "A confession served by a killer."

### (12) Self-defense questions

After the WFAA video, the prosecutor asked Sergeant Bukowski a series of self-defense-related questions.

> Q. . . . [During the interview at the police station, Cory] says he walked into his bedroom, reached up and grabbed the firearm, walked back out, got in the hallway, raised the firearm, and that's when he said it misclipped; correct?
>
> A. Correct.
>
> Q. Up until that point of the story, had [Cory] ever described being presented with deadly force?
>
> A. No.
>
> Q. Okay. Up until this point of the story had he described being in imminent danger from [Fernandez] or anything?
>
> A. No.
>
> Q. In fact, what he said when he raised the firearm -- pardon my language. He said, "This is bullsh-t, man." Is that what he told you?
>
> A. Correct.
>
> Q. Okay. Saying "This is bullsh-t, man," for being asked not to be loud in the middle of the night is not a cause to kill someone in the State of Texas, is it?
>
> A. It is not.
>
> . . . .
>
> Q. Okay. Let's assume for a minute that [it is] true . . . that there was a struggle for the firearm, and that the firearm went off and hit [Fernandez] in the stomach. Let's assume that. Shooting him again in the head is still a crime; correct?
>
> A. Yes.

Q. Okay. Shooting him -- what he says in his own words in the WFAA video -- . . . in the back of the head, that's murder; correct?

A. Yes.

Q. Okay. I mean, intending to end someone's life at that point, regardless of whether it was for mercy or some other reason, is not justified in the State of Texas; correct?

A. Correct.

Q. . . . He references getting control of the firearm and hitting the victim twice in the head with it. Do you recall that?

A. Yes.

Q. Okay. And then he said that -- that he shot the victim in the head after that; correct?

A. Yes.

Q. Okay. At any point did he provide a justifiable reason to point the firearm at Erik Fernandez?

A. No.

During cross-examination, Sergeant Bukowski agreed that Fernandez was about six feet tall and 200 pounds, while Cory was not quite six feet tall. He acknowledged that if someone is attacked and suffers injuries from someone larger, he could fear for his life. He also acknowledged that Cory had said that Fernandez came into his room and grabbed him, and that if that were true, then Fernandez would have been the aggressor. He agreed that Cory's story about being attacked as the reason for the shooting had stayed consistent.

On redirect, the prosecutor asked Sergeant Bukowski about inconsistencies in Cory's accounts and then about self-defense, stating,

Q. Okay. You mentioned -- or rather, [Defense Counsel] asked you about the scratch . . . in the corner . . . of [Cory's] right eye. Do you remember?

A. Yes.

Q. Okay. Would you agree with me that the first time that you asked [him] about the scratch, he said he didn't know how he got it?

A. Yes.

Q. And then the second time that he was asked, he talked about the cats and the dogs; right?

A. Correct.

Q. And then the third time he was asked, he said that it happened after he tried to shoot [Fernandez] and [Fernandez] grabbed the firearm?

A. Correct.

Q. Okay. If someone is trying to kill you in the State of Texas, you get to defend yourself; correct?

A. Yes.

Q. Okay. Up until the point where [Cory] said he walked into the hallway and tried to shoot [Fernandez] and it misclipped, did [Cory] describe receiving deadly force from Erik Fernandez?

A. No.

Q. Okay. Was he in any immediate harm?

A. No.

Q. Okay. Is [Fernandez's] statement of saying, "Some of us have to be up at 6:00 in the morning, [Cory]," is that justification to kill someone in the State of Texas?

A. No.

Q. [Defense Counsel] asked you about a size difference. Just perceiving that someone is larger than you is also, in the State of Texas, not cause to kill someone; is it?

A. No.

### d. White Settlement Police Lieutenant Denise Callahan

Lieutenant Callahan testified that after the police located Fernandez's Jeep, they found a lunchbox on the floorboard that contained his passport, social security card, driver's license, and cell phone. Through her testimony, the trial court admitted into evidence the Smith & Wesson .40-caliber bullet casing that had been found with the body, two Smith & Wesson .40-caliber bullets that had been found in Cory's room, the 48-ounce bottle of Mr. Clean, the mop, and the maps that Cory had drawn to where he had left Fernandez's Jeep and to the lake where he had thrown the gun, which they had been unable to find after searching the lake.

### e. White Settlement Police Sergeant Lana Cook

Sergeant Cook testified that Fernandez's Jeep was found at an apartment complex in White Settlement to which she had previously been called about stolen vehicles. It had been parked in a reserved parking spot, and the driver's door had been left ajar with the seat belt partially sticking out and the keys inside, in plain view. The trial court admitted into evidence maps of the apartment complex's location in relation to Cory and Fernandez's home and the photographs that Sergeant Cook had

20

taken of the Jeep. During cross-examination, Sergeant Cook testified that one could "absolutely" walk from where the Jeep was found to Cory's home.

### f. Former White Settlement Police CSI Laura Simmons

Simmons stated that on the first unroll of the rug, they found the Smith & Wesson .40-caliber shell casing. There were visible blood stains on the rug, particularly in the area around the head.

Simmons testified that "[i]mmediately upon entering [Cory's] room, [she] noticed a casing from a .40 caliber Smith & Wesson laying on the corner of a blanket on his bed." That caliber matched the one that was located with the victim, and she collected it before she was called back to the police station to photograph Cory's clothing.

When Simmons sprayed luminol on Cory's jacket, it luminesced, which indicated the possible presence of blood. She also sprayed luminol at the crime scene and testified as follows about the lumniscence:

> Q. Okay. Anything in particular that luminesced in the living room area?
>
> A. Yes.
>
> Q. What was it?
>
> A. Well, obviously, the -- what we assumed was the blood on the floor that you could visibly see with the naked eye already. And then once we sprayed the luminol, you could see what appeared to be dog prints and/or cat prints in blood.

21

Q. Okay. So that is in the living room where you've got what appears to be dog or cat prints walking in blood or what appears -- what is luminescing as apparent blood?

A. Yes.

Q. And then do you also spray down the hallway?

A. Yes.

Q. And that's leading up into the victim's bedroom?

A. Yes.

Q. Does the hallway also luminesce?

A. Yes.

Photographs of the scene, the Jeep, and everything she had collected and processed were admitted into evidence without objection and published to the jury.

### g. Gayla Fernandez

Fernandez's ex-wife testified that she and Fernandez had been married for fourteen years, had a daughter together,[7] and had remained friends. She stated that Fernandez had been generally in poor health—he struggled with diabetes and had stents in his heart. She also stated that she had to give Fernandez money to cover Cory's share of the rent "[m]ost of the time." Fernandez had talked with her about confronting Cory about the rent, but he had not wanted to have a difficult conversation.

---

[7]A photograph of Fernandez with his daughter was admitted into evidence and published to the jury.

On cross-examination, Gayle stated that she had probably helped Fernandez pay for Cory's share of the rent two or three times and that it had upset Fernandez to have to ask her for money. She stated that Fernandez would get frustrated when Cory came home late and disrupted his sleep. It had been clear to her that the roommate relationship was deteriorating.

### h. Tarrant County Deputy Chief Medical Examiner

Dr. Tasha Greenburg performed the March 2, 2019 autopsy and testified that Fernandez's primary cause of death was a gunshot wound to the head and neck. Other conditions that were not a direct cause of death were a gunshot wound to the right ear and blunt force injuries to the head. She stated that, generally, marks on the skin—muzzle pattern, soot deposition, stippling or tattooing from burning gunpowder—could be used to determine range; that, here, there was no muzzle imprint, soot, or gunpowder on Fernandez's corpse; that both gunshot wounds were from back to front, from two to four feet away; and that Fernandez did not have a gunshot wound to his abdomen.

Dr. Greenburg noted that there were various blunt force injuries present on Fernandez's body that included two small lacerations on the head. She was unable to say whether these injuries were defensive but agreed, over defense counsel's objection, that the injuries on top of the head were consistent with Cory's admission to striking him on the head with the firearm. Fernandez had also had a previous toe amputation and suffered from nephrosclerosis, consistent with diabetes, and

23

hypertensive atherosclerotic cardiovascular disease, neither of which contributed to his death. Fernandez had an inactive metabolite of cocaine and Gabapentin—an anti-convulsant used for seizures or nerve pain—in his blood, and his urine contained cannabinoids, an inactive cocaine metabolite, Benadryl, and Gabapentin. Dr. Greenburg said that none of these had caused Fernandez's death.

Fernandez's prescription medications, which were found at the scene, included Clopidogrel (a blood thinner), Lisinopril and Amlodipine (which treat blood pressure), Doxycycline (an antibiotic), Carvedilol (which treats heart disease), Atorvastatin (which treats high cholesterol), Pantoprazole (which treats stomach issues like reflux), Montelukast (which treats asthma), and Gabapentin. Dr. Greenburg testified that none of these medicines had caused his death. The trial court admitted ten autopsy photographs into evidence despite defense counsel's objections to State's Exhibit 202 and State's Exhibit 209 as "more prejudicial than probative" after the prosecutor explained that State's Exhibit 209 was the "more sanitized, cleaned-up" photo of Fernandez's face showing the exit wound, and State's Exhibit 202 was "just the overall appearance of the body as it came to the Medical Examiner's Office."

On cross-examination, Dr. Greenburg testified that nothing about the wounds on the head would tell her if there had been some sort of struggle, although the wounds' non-healing nature indicated that they were fairly fresh.

## 2. Analysis

At the conclusion of the State's case, the trial court denied Cory's motion for a directed verdict. In his second issue, Cory argues that this was error. Specifically, Cory argues that when the State rested, the evidence supporting his self-defense theory was "clearly contained in State's Exhibit 31," his police confession. He asserts that Dr. Greenburg's conclusions that Cory fired from feet away instead of inches did not contradict his story because "[s]tepping one or two feet away while reeling back from grabbing the gun—before firing—would have been logically consistent with Dr. Greenburg's findings." He further contends that his statement that he shot Fernandez the second time so that he would not suffer "was clearly a statement of emotion and did not rebut any of the evidence of self-defense."

However, Dr. Greenburg's testimony was that the second gunshot killed Fernandez, and the trial court could have determined that there were self-defense fact questions for the jury to determine when there was evidence that there had been an altercation between the two men but also evidence that Fernandez had already left the room when Cory grabbed his gun and went after him, they struggled again, and then Cory intentionally shot him twice. Cory's confession to the police and his WFAA interview both support this interpretation.

And, as pointed out by the State, the evidence also showed Cory's strong consciousness of guilt based on his actions in the offense's immediate aftermath. We note particularly Cory's disposal of the gun in the lake, his attempt to dispose of the

25

Jeep in a high-crime area before he called 911 over a day after the shooting, and his lies to the police in his 911 call, at the scene, and initially in his police interview. The trial court correctly denied the motion for directed verdict. *See Martinez v. State*, No. 04-09-00458-CR, 2011 WL 1402845, at *4 (Tex. App.—San Antonio Apr. 13, 2011, no pet.) (mem. op., not designated for publication) (reaching same conclusion on similar facts); *see also Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010) (stating that a rational trier of fact could consider an appellant's untruthful statements, "in connection with the other circumstances of the case, as affirmative evidence of appellant's guilt"); *Johnson v. State*, 452 S.W.3d 398, 403–04 (Tex. App.—Amarillo 2014, pet. ref'd) (noting that the appellant's statements did not conclusively prove a claim of self-defense and that the fact that the appellant "walked up to [the victim] after the first shot and shot [him] a second time in the back while he lay on the floor, if believed by the jury, is evidence negating his claim of self–defense"); *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (noting that, as the sole judge of credibility, a jury is free to disregard the defendant's testimony). We overrule Cory's second issue and turn to Cory's first issue challenging the sufficiency of all of the evidence—including that presented in his own case—to support his conviction.

## C. Sufficiency

### 1. The Defense's case

Cory was the only defense witness during the trial's guilt–innocence phase. He testified that he had an associate's degree in liberal arts and a bachelor's degree in political science and that he had moved to Texas after his mother died. He had lost a few jobs due to his alcohol use, and he had lived with Fernandez for six months but had known him longer from their bartending work. He had driven Fernandez to the hospital a couple of times.

On Wednesday, February 27, Cory was at work when he received a text from Fernandez about rent. He cursed aloud when he read the text, and his manager told him to go home. Instead, Cory went to a friend's house and had a few drinks first. It was late—"probably around 1:00 o'clock in the morning"—when Cory arrived home, and he woke Fernandez, who had been sleeping on the living-room couch. He testified that Fernandez yelled from the couch, "Damn it, [Cory,] I have to get to work in the morning. Can you be more quiet?" Cory stated that Fernandez then walked into his room and grabbed him and that, although this was the first time Fernandez had gotten physical with him, he recalled that in December, Fernandez "told [him] that he [had] talked to his friends about . . . the[ir] situation, and they told him he should beat [Cory] with a baseball bat." Cory testified that when Fernandez grabbed him, he said, "Man, I've had enough. This is BS," and then he reached into the box at the end of the bed and got out his pistol.

Cory went out into the hallway, where Fernandez was blocking his entrance to the living room. Cory testified,

> I know I said before that I pointed [the gun], but if I would have pointed it at him, he would have ran, most likely. I mean, any normal person would have. But I had [the gun] to my side.
>
> And at that time, you -- you see the scrape on my eye. As I go by him, he kind of turns sideways to kind of let me walk by, which that's good. And then he grabbed the gun out of my hand, and we start wrestling over it at that point.

Cory said that Fernandez pointed the gun at him and "it clicked" and then Fernandez cocked the gun while they were struggling. Cory said that he had thought Fernandez said he was shot and this was why he had believed Fernandez had been shot in the stomach. Fernandez then grabbed the gun's barrel and moved a bit, resulting in the gunshot to his ear, and then as Fernandez spun in response to the hit, Cory fired the shot that hit Fernandez in the back of the neck.

Cory testified that he had been in fear for his life after Fernandez grabbed him, and then he testified as follows.

> Q. Now, as y'all are wrestling for the gun, as you're walking out, you say he grabs it. Are you still in fear for your life then?
>
> A. More so than ever.
>
> Q. What about when you say that he pointed the gun at you? Were you in fear for your life then?
>
> A. Absolutely.
>
> Q. Okay. And so then are you telling this jury that as y'all wrestled for the gun, the gun went off?

A. Yes, sir.

Q. And that's the first one to the ear?

A. Yes, sir.

Q. And then when you told this jury that at some point you got control of the gun --

A. Yes, sir.

Q. -- as he tried to spin away from you -- or -- or what's going on at that --

A. As -- as -- as the -- as I had the gun and he grabbed it, it fired and hit him in the ear. And as it hit him in the ear, he spun at that point. So I thought it was like a more -- I didn't know where it hit. I thought it was more of a direct shot, like, in this area. I didn't know it was in the ear at this point.

Q. But then that's when the gun goes off again?

A. Yes.

Q. Or how does the gun go off on the second shot?

A. When he grabbed it like that, it came -- it stopped me, and I came back down, and I pulled it. And that's why you see it coming from the lower to the upper part.

Cory testified that after the shooting, he freaked out, left, and went home only to check on their pets. He finally called 911 because he could not just leave Fernandez's body there, and he admitted that when the police came, he lied to them and then kept lying. Cory claimed that when he confessed to the police, he "told them what [he] thought they wanted to hear." Cory stated that he suffered from a rare form of sleep disorder and that he had been unable to rest between the shooting and his confession. He claimed that he had blacked out during his WFAA interview.

29

During cross-examination, when the prosecutor asked, "You said you shot a second time in the head to end his life because he was in pain and gutshot wounds to the stomach are more painful; correct?" Cory replied, "Correct." Cory contended that it was not wrong to protect himself but that it was wrong for him to have waited a few days after the shooting to confess. He acknowledged that he said nothing in the fourteen-hour police interview about having been in fear for his life or afraid of Fernandez. Cory asserted that he did not recall saying anything in his police interview about hitting Fernandez with the firearm.

Cory acknowledged that his testimony did not match Dr. Greenburg's that the bullet travelled from Fernandez's back to his front and that there were no burn marks or soot on Fernandez's face. He insisted, "We fought over a gun . . . and I did everything to save my life."

On redirect, Cory admitted that he had lied and had given different versions of what happened that night, and then he gave the following testimony:

> Q. Were you freaking out?
>
> A. Yes.
>
> Q. Were you thinking straight?
>
> A. No.
>
> Q. Were you sleeping?
>
> A. No.
>
> Q. Were you eating?

A. No.

Q. As a matter of fact, whenever you got something to eat, you threw it up; right?

A. Yep.

## 2. Analysis

Cory directs us to his testimony that he had been in fear for his life and that, at one point, Fernandez had control of the gun during their struggle. He argues that the State presented no evidence that he had not been in fear for his life or that he had not struggled with Fernandez, although he acknowledges that the State showed that he had changed his story, had hidden Fernandez's Jeep, and had not called the police for three days after the shooting. Cory argues that the State's evidence merely "shows panic *after* the event."

Cory disregards that the jury—as the judge of the evidence's weight and credibility—was free to disbelieve all or any part of his testimony, particularly when compared to his videotaped confessions and the physical evidence. *See Martin*, 635 S.W.3d at 679. Further, we must presume that the jury resolved any conflicting inferences in the verdict's favor and defer to that resolution. *Braughton*, 569 S.W.3d at 608. The evidence shows that Cory killed Fernandez, an unarmed man whose body was wracked with diabetes and heart problems, by shooting him in the ear and then in the back of the head. The jury could have determined that Cory murdered Fernandez without justification and then took several actions, including lying numerous times, to

31

avoid responsibility. Or the jury could have believed Cory's account—that Fernandez grabbed his shoulder—but nonetheless found against his self-defense claim because it determined that his belief that deadly force was immediately necessary was not reasonable either after Fernandez left the room or during their subsequent struggle. Because there was ample evidence upon which the jury could resolve any conflicts, determine the witnesses' credibility, and find Cory guilty of murder, we conclude that the evidence is sufficient to support his conviction, and we overrule his first issue. *See Matthews v. State*, No. 02-21-00182-CR, 2022 WL 16845112, at *11 (Tex. App.—Fort Worth Nov. 10, 2022, pet. ref'd) (mem. op., not designated for publication) (reaching same conclusion on similar facts).

### III. Mistrial

Cory asserts in his seventh issue that the trial court abused its discretion by denying a mistrial after the prosecutor speculated that he had lived with the corpse for three days, which he contends improperly reinforced the idea that he had lived with a dead body for multiple days. He refers us to a portion of Sergeant Bukowski's testimony that occurred after the WFAA video's publication.

The complained-of portion of the record sets out the following:

Q. Okay. I want to ask you a little bit about [Cory's] actions after the fact. Would you expect someone who acted in either self-defense or someone who made a mistake or was part of an accident *to live with a dead body for several days*? [Emphasis added.]

A. No.

32

[Defense counsel]: Objection, speculation, Judge.

THE COURT: Excuse me. Could you repeat your question?

[Prosecutor]: Sure.

Q. ([Prosecutor]) Based on your experience and training as a peace officer in the State of Texas for approximately 17 years, would you expect that someone who acted in self-defense or had made a mistake[] or was involved in an accident, *to live with a dead body for multiple days* with the thermostat at 60 degrees? [Emphasis added.]

THE COURT: Just a second.

What's your objection?

[Defense counsel]: Speculation.

THE COURT: Okay. Sustained.

Go ahead.

[Defense counsel]: I ask that you instruct the jury to disregard.

THE COURT: Jury will disregard the most recent question by the prosecutor.

[Defense counsel]: Move for a mistrial.

THE COURT: Denied.

Cory complains that the State's speculative question "directly contradicted" his testimony that he left immediately after shooting Fernandez "and thus gave the appearance that [he] was testifying falsely."

The State responds that the there was no abuse of discretion based on the nature of the complained-of question, the other evidence on the same issue, the

33

remaining evidence demonstrating Cory's guilt, and the trial court's instruction to disregard. The State also points out that during cross-examination, Sergeant Bukowski confirmed that Cory never told him that he had lived with the corpse and that the question that elicited the confirmation had referenced the WFAA news clip.[8] The State also notes that Cory never objected to the admission of the WFAA news clip on the ground that it contained improper speculation about his living with Fernandez's

---

[8]During cross-examination, defense counsel asked Sergeant Bukowski,

Q. . . . When we saw the WFAA video and also the video that my client did with you at the police station, there were a couple of things that were small things that were different.

For instance, *he never -- he never lived in there with that corpse, right?* I mean, whenever he spoke to you, he said that he had just come home and that's when he found him; is that correct? [Emphasis added.]

A. Correct.

. . . .

Q. One last thing. With the exception of the minor differences between the story he told at the police station and the one on WFAA -- and when I say the minor exception, *I'm talking about the news kind of glamorized it and made it seem like he was living there with a corpse for three days.* Other than that, the stories pretty much matched up from what he told you and what he told the news station; right? [Emphasis added.]

A. I don't believe so. I believe when he was telling us at the PD, he said one shot to the head.

34

dead body.[9] *See Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (op. on reh'g) (noting that the admission of other similar evidence can render error harmless).

We review the denial of a motion for mistrial for an abuse of discretion, and the ruling must be upheld if it was within the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). We balance three factors in reviewing whether a mistrial was warranted: (1) the misconduct's severity (the magnitude of the prejudicial effect of the prosecutor's remark); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007).

Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (holding that a prompt instruction to disregard, coupled with the case's circumstances, may render an error harmless). This is because a jury is presumed to follow an instruction to disregard unless something in the record suggests that it could not follow the instruction. *Coble*, 330 S.W.3d at 292–93. Something in the record that

---

[9]Cory's sole objection to the WFAA video was lack of proper predicate based on authentication.

might suggest that the jury could not follow the instruction would include prosecutorial misconduct. *See Stahl v. State*, 749 S.W.2d 826, 831 (Tex. Crim. App. 1988) (listing three factors that might indicate prosecutorial misconduct—objections, deliberate violation of express court orders, and blatant misconduct "border[ing] on being contumacious").

The record here reflects neither blatant prosecutorial misconduct nor the deliberate violation of express court orders. Further, even without the prosecutor's question to Sergeant Bukowski, the WFAA video had already introduced—without objection—the statement about Cory's "living with a corpse for days," and as set out in our sufficiency review, Cory's statement in the WFAA interview about having put a bullet in the back of Fernandez's head "to make sure that he was dead"—in addition to ample other evidence—effectively killed his self-defense argument and made his murder conviction certain regardless of how long he might have stayed in the apartment with the corpse. *See Archie*, 221 S.W.3d at 700. The jury is presumed to have followed the trial court's instruction to disregard, *see Coble*, 330 S.W.3d at 292–93, and that instruction—along with the case's remaining circumstances—rendered any error harmless and mistrial inappropriate. *See Ovalle*, 13 S.W.3d at 783–85. We overrule Cory's seventh issue.

## IV. Evidentiary complaints

In his third, fourth, fifth, sixth, eighth, ninth, and tenth issues, Cory raises a variety of evidentiary complaints. We review a trial court's evidentiary rulings for an

abuse of discretion and must uphold them if they were within the zone of reasonable disagreement. *See Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020).

Further, to preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). While preservation does not require "magic language," it must be clear from the record that the trial court understood the basis of the objection, *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016), and an objection preserves only the specific ground cited. Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Evid. 103(a)(1)(B). That is, while no "hyper-technical or formalistic use of words or phrases" is required for an objection to preserve an error, the objecting party must still "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (quoting *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009)).

And, generally, a party must object each time objectionable evidence is offered, and a trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.); *see Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).

## A. Hearsay

In his third issue, Cory argues that the trial court abused its discretion by admitting inadmissible hearsay about Fernandez's time of death because Greer, who testified about it, was not a medical examiner and was merely repeating an out-of-court statement he had heard from MedStar personnel. But Cory did not object to the same information that was admitted into evidence without objection and published to the jury in State's Exhibit 19, Greer's body camera footage. Because Cory failed to object to the same evidence on the body camera footage, he has failed to preserve this complaint for our review. *See* Tex. R. App. P. 33.1; *Leday*, 983 S.W.2d at 718; *Clay*, 361 S.W.3d at 766. We overrule his third issue.

## B. Business record

In his fourth issue, Cory argues that the trial court abused its discretion by admitting into evidence State's Exhibit 20, the MedStar report sponsored by a business record affidavit, without the proper predicate. He complains that "[Greer] only testified to knowledge of a few of the facts"—specifically, the date, time, and location—"but not the majority of facts," making him unqualified, and he refers us to Rule of Evidence 803(6). The trial court admitted the records after the prosecutor informed the trial court, "This business record affidavit has been on file for 14 days and provided to defense counsel. So these records are self-authenticating. This witness has identified and made them relevant by the victim's name, his date of birth, address, and the date and time."

Rule of Evidence 803(6) provides that records of a regularly conducted activity "are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness," if

> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted business activity;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, *or by an affidavit or unsworn declaration that complies with Rule 902(10)*; and
>
> (E) the opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Tex. R. Evid. 803(6) (emphasis added). As referenced in Rule 803(6), an item of evidence is self-authenticating and requires no extrinsic evidence of authenticity to be admitted if it is a business record accompanied by affidavit that has been served on each party at least fourteen days before trial and includes the appropriate business-records affidavit language. Tex. R. Evid. 902(10). State's Exhibit 20 was accompanied by a business record affidavit, and Cory did not challenge the affidavit's sufficiency under Rule 902(10). *See* Tex. R. App. P. 33.1.

Further, as pointed out by the State, the report "merely summarized the action of the paramedics who responded to Cory's apartment" and contained most of the same information as Greer's testimony about the scene and his body camera footage,

39

which was admitted without objection. *See Leday*, 983 S.W.2d at 718 ("[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."). Accordingly, we overrule Cory's fourth issue.

## C. Optional completeness

In his fifth issue, Cory argues that the trial court abused its discretion by failing to admit the unredacted police interview under Rule of Evidence 107, the rule of optional completeness, which provides that if a party introduces—among other things—part of a recorded statement, an adverse party may inquire into any other part on the same subject and "may also introduce any other . . . recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent." Tex. R. Evid. 107. This evidentiary rule is designed to reduce the possibility of the jury's receiving a false impression from hearing only a part of some act, conversation, or writing. *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011). To be admitted under Rule 107, the omitted portion of the statement must be "on the same subject" and must be "necessary to make it fully understood." *Id.*

Here, the State offered the redacted copy of the interview (State's Exhibit 31) for all purposes and the unredacted copy (State's Exhibit 30) for the record only. At that point, Cory stated that he had no objections but asked for State's Exhibit 30 "to be admitted for all purposes as well." After the prosecutor objected to the admission of State's Exhibit 30 "for all purposes subject to the Texas Rules of Evidence and our

40

conversation outside the presence of the jury," the trial court stated, "For now, I will admit 30 for record purposes only. We can talk about that at a break further."

The record reflects that Cory did not raise any objection based on Rule 107, did not identify a specific unredacted excerpt under that rule, and did not later seek to admit State's Exhibit 30 or any unredacted excerpt on that basis or any other. *See* Tex. R. App. P. 33.1. Further, Cory failed to argue that State's Exhibit 30 or a specific unredacted excerpt from it was necessary to explain or to allow the jury to fully understand his interview and to prevent the jury from receiving a false impression. *Cf.* Tex. R. Evid. 107; *Pena*, 353 S.W.3d at 814. Because Cory did not preserve a Rule 107 complaint for our review, we overrule his fifth issue. *See* Tex. R. App. P. 33.1.

**D. WFAA interview**

In his sixth issue, Cory argues that the trial court abused its discretion by admitting into evidence the WFAA interview because it failed to take judicial notice of WFAA's Federal Communications Commission (FCC) license.

When the prosecutor sought to admit the WFAA video during Sergeant Bukowski's testimony, Cory stated, "We object to that as just not being the proper predicate. This wouldn't be the witness to authenticate that. *It would have to be somebody from WFAA*." [Emphasis added.] The prosecutor then replied that the video was self-authenticating under Code of Criminal Procedure Article 38.111. *See* Tex. Code Crim. Proc. Ann. art. 38.111 ("Extrinsic evidence of the authenticity of evidence as a condition precedent to the admissibility of the evidence in a criminal proceeding is

41

not required with respect to a recording that purports to be a broadcast by a radio or television station that holds a license issued by the [FCC] at the time of the recording."). The trial court overruled the objection.

On appeal, Cory complains that the trial court did not take judicial notice of the FCC license. *See id.* ("The court may take judicial notice of the recording license as provided by Rule 201, Texas Rules of Evidence."). Because Cory failed to raise this objection in the trial court, this complaint is not preserved, *see* Tex. R. App. P. 33.1, and we overrule his sixth issue.

## E. Expert testimony

In his eighth issue, Cory argues that the trial court abused its discretion by allowing Dr. Greenburg to testify about the cause of Fernandez's blunt-force injuries without laying foundation.

The State responds that Dr. Greenburg's testimony regarding a possible cause of an injury was a proper expert opinion based on a hypothetical that mirrored the case's facts, particularly in light of her earlier testimony that Fernandez's cause of death was a gunshot wound to his head or neck and that he had blunt force injuries on his body, including an abrasion on the right side of his forehead. The State further argues that any error was harmless because of Cory's own recorded statement that he hit Fernandez in the head with his firearm.

Dr. Greenburg explained the autopsy process generally before turning to her autopsy of Fernandez, in which she determined that his primary cause of death was a

gunshot wound to the head and neck. She noted that in addition to the primary gunshot wound, Fernandez had a secondary gunshot to the right ear and "blunt force injuries of the head" that were not a direct cause of death. She then discussed the fatal and nonfatal gunshot wounds before generally explaining decomposition and other postmortem changes and their role in determining when a person died. The prosecutor then asked, "So if I represented to you that this defendant said that . . . he killed this victim on Wednesday, and his body was discovered by law enforcement on Friday night, would [Fernandez's] decomposition and the appearance of his body be consistent with that?" Dr. Greenburg opined that the time frame "could be consistent."

The prosecutor then asked Dr. Greenburg about other injuries to the exterior of Fernandez's body, and she again noted that there were "blunt force injuries present on the body as well as the gunshot wounds." Regarding the time frame, she explained that if a wound had started healing, then it was older than one that was still fresh. Because there were no healing wounds noted on Fernandez's body, she opined that the wounds "were more recent, but exactly when they occurred is difficult."

Dr. Greenburg discussed Fernandez's other conditions—such as diabetes and cardiovascular disease—that had no effect on his death before reaching the portion of her testimony to which Cory refers us regarding whether Fernandez's blunt force injuries were consistent with being struck by a firearm:

43

Q. Back to the blunt force injuries on his head, I wanted to ask you, if I represented to you that this defendant, Jeffery Cory, stated that he hit Erik Fernandez in the head with a firearm, could those abrasions be consistent with that?

[Defense counsel]: *Objection, speculation.* [Emphasis added.]

THE COURT: Could you repeat the question?

[Prosecutor]: Sure.

Q. . . . Based on your training and experience as the Deputy Chief Medical Examiner, if I represented to you that this defendant, Jeffery Cory, had admitted to striking Erik in the head with a firearm, could the injuries on the top of his head be consistent with that?

THE COURT: What's your objection?

[Defense counsel]: *Speculation as to the type of weapon used.* [Emphasis added.]

THE COURT: Overruled.

Q. . . . You can answer.

A. That could be consistent, yes.

Later in Dr. Greenburg's testimony, Cory raised no objection to the trial court's admitting a diagram of Fernandez's injuries, showing, among other injuries, two abrasions on Fernandez's forehead. During cross-examination, Dr. Greenburg testified that she was unable to tell from the other wounds if there was a struggle, stating, "There's . . . nothing about those wounds that would tell me that."

Before Dr. Greenburg's testimony and during a portion of his police interview, Cory told the police that in the struggle over the gun, he had hit Fernandez with the blunt side of the gun, and he gestured at a height. During Sergeant Bukowski's

44

testimony, the sergeant answered, "Yes," when the prosecutor asked, "He references getting control of the firearm and hitting the victim twice in the head with it. Do you recall that?" In contrast, during his testimony during the defense's case—after Dr. Greenburg's testimony—Cory asserted that he did not recall saying anything in his police interview about hitting Fernandez with the firearm.

An expert may respond to hypotheticals to apply her knowledge to the facts of the case and may offer an opinion based solely on hypothetical questions posed at trial. *Tillman v. State*, 354 S.W.3d 425, 439 (Tex. Crim. App. 2011). A hypothetical question based upon facts in evidence or an expert's personal knowledge may form the basis for an expert's opinion testimony. *See Mays v. State*, 726 S.W.2d 937, 950–51 (Tex. Crim. App. 1986); *see also Blasdell v. State*, 384 S.W.3d 824, 830 (Tex. Crim. App. 2012) ("If a hypothetical question fails to echo any particular 'event' that 'occurred in that particular case[,]' it would result in expert testimony that is not relevant for purposes of Rule 702 because it does not 'fit' the facts of the case and therefore cannot help the jury.")

Because the hypothetical question here was based on facts in evidence and the results of the autopsy that Dr. Greenburg had performed, she could opine that the nonfatal injuries to Fernandez's head could be consistent with being struck with a gun. The trial court did not abuse its discretion by overruling Cory's objections to speculation, and we overrule his eighth issue.

## F. Autopsy photos

In his ninth issue, Cory argues that the trial court abused its discretion by admitting cumulative photos that were more prejudicial than probative. Specifically, he complains that State's Exhibit 202 (the photo of Fernandez's body's overall appearance when it arrived at the Medical Examiner's Office) and State's Exhibit 209 (the photo of Fernandez's face showing the exit wound) were unnecessary and gruesome when "a myriad of other photos had already been admitted." The State responds that the probative value of State's Exhibits 202 and 209 was not substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403.

When undertaking a Rule 403 analysis, the trial court must balance (1) the inherent probative force of the proferred item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

Further, a court may consider the following nonexclusive factors in determining whether a photograph's probative value is substantially outweighed by the danger of unfair prejudice: the number of photographs, their gruesomeness, their

detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed, and whether the body has been altered by autopsy in some way that might enhance the photograph's gruesomeness to the appellant's detriment. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009); *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004); *Reese v. State*, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000). Overall, the photograph must be helpful to the jury; "[i]f there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects." *Erazo,* 144 S.W.3d at 491–92.

The photos were in color. State's Exhibit 202 showed Fernandez's clothed body in the condition it was brought into the Medical Examiner's Office—his bloody face and shirt and bagged hands. State's Exhibit 209 showed Fernandez's face after the blood had been cleaned off to show where the bullet exited.

The State offered and the trial court admitted 14 photos, State's Exhibits 202–215, during Dr. Greenburg's testimony, and Dr. Greenburg explained the contents of each one. The trial court had previously admitted 29 photos showing the body or related images in situ.[10]

---

[10]The trial court admitted State's Exhibit 12, which showed the rolled-up rug, and State's Exhibit 13, which showed the rolled-up rug with a hand sticking out, during Greer's testimony. During Simmons's testimony, the trial court admitted State's Exhibits 79–84, 86–87, 89, 106, and 108, showing the rolled-up rug at the

As to State's Exhibit 202, Dr. Greenburg testified that the photo documented the body's condition when the Medical Examiner's Office received it for the autopsy. The trial court could have determined that this photo was substantially more probative than prejudicial in that it allowed the jury (1) to evaluate the medical examiner's testimony and credibility as she guided them through the remaining autopsy photos and testified about the autopsy results and (2) to evaluate Fernandez's body outside the framework of the crime scene's bloody rug. *See Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) ("Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions."). Accordingly, we cannot say that the trial court abused its discretion by admitting State's Exhibit 202, and we overrule this portion of Cory's ninth issue.

As to State's Exhibit 209, Dr. Greenburg testified that it showed "the exit defect of the Gunshot Wound A of the back of the neck" as well as a laceration next to it, which was associated with the fracture of Fernandez's cheekbone, and some abrasions on his forehead, nose, and lips. Autopsy photographs are generally admissible unless they depict mutilation caused by the autopsy itself, *Rayford v. State*, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003), which is not the case here. And

---

crime scene; State's Exhibits 85, 88, 98–100, 102, 107, and 115, showing a bloodstain on the rug; State's Exhibits 90–92 and 94–96, showing the body unrolled on the rug; and State's Exhibits 116–117, showing the rolled-up rug with a hand sticking out.

photographs that depict the nature, location, and extent of a wound have been declared probative enough to outweigh any prejudicial effect. *Frank v. State*, 183 S.W.3d 63, 77–78 (Tex. App.—Fort Worth 2005, pet. ref'd). Therefore, the trial court did not abuse its discretion by admitting State's Exhibit 209, and we overrule the remainder of Cory's ninth issue.

## G. Punishment evidence

In his tenth issue, Cory argues that the trial court abused its discretion by admitting State's Exhibits 236–239, photos of two guns—one with a silencer—during the trial's punishment phase without adequate notice to the defense. *See* Tex. Code Crim. Proc. Ann. art. 39.14 (addressing discovery requirements). Cory complains that the State failed to comply with Article 39.14 because the State's extraneous-offense notices did not include State's Exhibits 236–239. Cory asserts that he was harmed because the lack of adequate notice of the photos prevented him from being able to present an adequate response.

Outside the jury's presence, the prosecutor informed the trial court that the State had received the photos the day before—the same day that the State gave notice to Cory's counsel—and Cory's counsel argued that admitting those photos was "akin to trial by ambush." Because the State had previously given notice of extraneous offenses pertaining to Cory's possession of firearms and his possession of a firearm

49

with a homemade suppressor on it,[11] the trial court noted, "the only issue is really the production of the photos."

During Cory's stepmother's testimony, she testified that she had taken the photographs in State's Exhibits 236, 237, 238, and 239. Cory objected to the photographs' admission based on his prior objection, and the trial court overruled the objection. Cory's stepmother then testified that she had found the guns when she was cleaning the living room and that when she had asked Cory's father if they were his, he said no, and Cory had been the only other person to live in the house with them.

Under Article 39.14(a), the State is required to produce photographs "material to any matter involved in the action and that are in the possession, custody, or control of the [S]tate or any person under contract with the [S]tate." Tex. Code Crim. Proc. Ann. art. 39.14(a). The photographs were not in the State's control until the day

[11]The State filed an original and three supplemental extraneous-offense notices, beginning in May 2022. The original May 9, 2022 notice listed "Possess/Manufacture/Sell a Dangerous Weapon," on or about June 26, 2002, in Fresno, California, as well as three other offenses: "Felon or Addict in Possession of a Deadly Weapon," "Prohibited Ownership of Ammunition," and "Possession of a Silencer," dated on or about June 8, 2014, with the State of California listed as the victim. In the State's first supplemental notice, filed the same day as the original, the State changed the county of the deadly-weapon, silencer, and ammunition charges to Fresno County. In the State's second supplemental notice, filed on January 18, 2023, the State notified Cory that on or about January 1, 2014, or January 1, 2015, when Cory lived in Fresno County with his father and stepmother, his stepmother "found two loaded revolvers, including one with a silencer," she called the police, and Cory was arrested. In the State's third supplemental notice, filed on January 24, 2023, in addition to a laundry list of other bad acts, the notice again listed the two loaded guns found by his stepmother—a revolver and "another type of gun with a silencer." Cory's trial began on February 6, 2023.

50

before the trial's punishment phase—the same day that the State notified Cory's counsel about them—and there is no evidence that Cory's stepmother was under contract with the State. *See id.* Accordingly, there was no violation of Article 39.14 or any corresponding abuse of discretion in the photographs' admission. We overrule Cory's tenth issue.

## V. Cumulative error

In his final issue, Cory complains that the cumulative effect of the errors in his third through tenth issues deprived him of a fair trial.

The doctrine of cumulative error provides that the cumulative effect of several errors can, in the aggregate, constitute reversible error, even though no single instance of error would. *Schmidt v. State*, 612 S.W.3d 359, 372 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). Although "[i]t is conceivable that a number of errors may be found harmful in their cumulative effect," there is no authority holding that non-errors may, in their cumulative effect, cause error. *Chamberlain*, 998 S.W.2d at 238; *see Jenkins v. State*, 493 S.W.3d 583, 613 (Tex. Crim. App. 2016) (overruling appellant's cumulative-error complaint when he failed to show that the trial court erred "with respect to any point of error"). That is, in a cumulative-error analysis, we consider only errors that were preserved for appeal and are actually errors. *Schmidt*, 612 S.W.3d at 372.

As set out above, there are no errors in this case to cumulate. *See id.*; *see also Bell v. State*, No. 02-18-00244-CR, 2019 WL 1967538, at *9 (Tex. App.—Fort Worth May 2, 2019, pet. ref'd) (mem. op., not designated for publication) (noting that there was

no error to cumulate when appellant's "individual points either d[id] not demonstrate reversible error or d[id] not show that he was harmed"). Accordingly, we overrule Cory's eleventh issue.

## VI. Conclusion

Having overruled all of Cory's issues, we affirm the trial court's judgment.


/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 6, 2024